Rochester First National Bk. *v.* Fry, Appellant.

426

Argued October 3, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*R. S. Holt,* of *Holt, Holt & Richardson* and *E. M. Well-over,* for appellant.—Where the contract defines the time when the promisor is to assume liability for the debt, his obligation is that of suretyship; but where there is no time fixed the obligation is general and merely that of guaranty: Homewood People's Bank v. Hastings, 263 Pa. 260; First Nat. Bank of Leesport v. Houck, 18 Berks Co. R. 174.

No notice of default was given to defendant by plaintiff; in a case of guaranty, such notice is required: Sullivan, Smithfield Co. v. Welsh, 91 Pa. Superior Ct. 413.

The competency of a witness as to disputed handwriting is, in the first instance, clearly a matter for the court; and where no subsequent evidence raises a dispute of facts as to his competency, the court is the sole judge of competency: Wilson v. Van Leer, 127 Pa. 371.

A charge which directs the jury to disregard relevant evidence is erroneous: Hoffman v. R. R., 143 Pa. 503; Bovard v. Christy, 14 Pa. 267.

A charge is misleading which assumes as a fact what is for the jury: Branson v. Kitchenman, 148 Pa. 541, 550.

*Leonard Ewing,* of *Martin, Swaney & Ewing,* with him *M. F. Mecklem,* for appellee.—The contract was one of suretyship: Sullivan, Smithfield Co. v. Welsh, 91 Pa. Superior Ct. 413; Miners State Bank v. Auksztokalnis, 283 Pa. 18; Homewood Peoples Bank v. Hastings, 263 Pa. 260.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, November 26, 1928:

Plaintiff bank recovered a verdict against H. C. Fry on what it claimed to be a contract of suretyship; judgment was entered accordingly and defendant has appealed.

From the evidence presented at trial, facts sustaining the verdict could be found as follows: On July 9, 1915,

Fry, then the president of plaintiff bank, requested from his institution a loan for one John M. Patterson, on a note executed by the latter, dated the same day, payable at the end of four months. He said that the proposed borrower, who was not a customer of the bank, was worthy of credit for the amount of the note. At the same time, Fry handed the bank's cashier a memorandum which stated defendant's willingness to sign a separate undertaking that the note would be paid, and offered as additional collateral two hundred shares of the stock of the Craven Tool Company, standing in the name of Patterson, producing the certificate therefor, with a signed power of attorney authorizing transfer. He also gave information, including a printed circular describing the product and character of the tool company, for use of the bank's board of directors in passing on the desired loan.

Fry was acquainted with Patterson, but the latter was a stranger to the other officers of the bank, and was not present when negotiations for the loan were being made on his account, or later when it was granted by plaintiff. When the note was discounted, John H. Mellor, cashier of the bank, prepared a paper, dated July 9, 1915, and addressed to the First National Bank, Rochester, Penna., as follows: "For value received I hereby guarantee payment of John M. Patterson's Five Thousand Dollar note, dated July 9th with Two Hundred (200) shares of Craven Tool Company stock as collateral. This guarantee to extend to any renewals of the same." This paper was signed by Fry, whereupon, at his direction, credit for $5,000 was given to the Craven Tool Company, the designatee of Patterson. The written undertaking of Fry to be responsible for payment of Patterson's debt, the collateral, and the other papers connected with the application for the loan, were put by Mellor in an envelope, which was placed in the safe deposit vault of plaintiff bank.

The original note was reduced and renewed from time to time until July 3, 1922, when it was finally renewed at $3,500 for a period of two months. This last note was not paid, and in 1924 was marked off the books by plaintiff bank, as a bad loan. At that time, the bank credited on the note $125, deposited with it by the tool company; and, in this way, the obligation was reduced to $3,375, irrespective of interest.

Fry's written agreement to be responsible for Patterson's debt to the bank seems to have been overlooked by the officials of that institution until the fall of 1926, when it was discovered by a bank examiner, who called the cashier's attention to it. Plaintiff immediately made demand on defendant for payment of the amount remaining due; and, when this was refused, the present suit was instituted to recover against Fry, as surety, on his above quoted undertaking of July 9, 1915.

Two affidavits of defense were filed. In the first, Fry denied that he had executed the undertaking in question or that he had ever assumed responsibility for the payment of Patterson's note. Further, he averred that, owing to lapse of time before bringing suit, "any claim based on the said alleged guaranty, if any the plaintiff ever had, [was] barred by the statute of limitations." The second affidavit of defense averred that the full amount of the original note and "all proper renewals thereof" had been paid by Patterson, and that the note "attached to the statement of claim" was "the renewal of part of another note for $5,000 given by the said John M. Patterson to the plaintiff a short time after the execution and delivery of the original note mentioned in the statement of claim."

The defense of payment does not seem to have been urged at trial, and no question with reference to it arises at this time. Aside from the statute of limitations, which is not pressed on this appeal, the defenses insisted upon at trial were, first, that the paper of July 9, 1915, assuming responsibility for the payment of Patterson's

note and renewals thereof, had not been signed by Fry, and that the signature which appeared thereon was a forgery; next, if the jury rejected this defense, then, that the court should rule as a matter of law that the paper in question was a guaranty, not a suretyship, and, there being no evidence of plaintiff's having pursued the principal debtor with due diligence or of the latter's insolvency, Fry could not be held responsible as guarantor. In connection with these defenses, appellant specifies that the court below erred in not directing a verdict in his favor or subsequently entering judgment for him n. o. v.; he also alleges numerous trial errors, each of which we shall briefly consider in the order of their assignment.

As to appellant's first assignment of error, covering his claim for judgment n. o. v., it is necessary to say only that the evidence presented at the trial under review was of a character which required the case to be passed upon by a jury.

The second assignment complains because the cashier of plaintiff bank was allowed to testify to the fact that demand had been made on defendant for payment of the note; in this we see no error.

The third and fourth assignments complain because the court below admitted in evidence the memorandum stating defendant's willingness to sign "a separate guaranty," the descriptive circular of the Craven Tool Company, the certificate of stock of that corporation pledged as collateral, and the power of attorney to transfer the latter. In passing on these assignments, it must be kept in mind that Fry's principal defense was that he had never assumed any responsibility for payment of the loan to Patterson; that the so-called guaranty, on which he was being sued, had not been signed by him,—that it was a forgery. When on the stand, he admitted that the memorandum promising the guaranty was in his handwriting, and he made no allegation that it did not refer to the original note for the Patterson loan, but

stated it had been given to the cashier of the bank either several days prior to the day of the loan or sometime thereafter. In other words, he contended that the memorandum under objection constituted no part of the res gestæ of the discounting of the note by plaintiff; whereas Mellor, the bank's cashier, testified to facts which made this memorandum, leading to the guaranty, a very important part of the loan transaction. Moreover, it appeared that the memorandum in question was written on the reverse side of a letter addressed by a third party to defendant, and this letter bore a date which tended to sustain Mellor's testimony, and discredit defendant's denial that the memorandum had been given to the bank on July 9, 1915, when Fry applied for the Patterson loan. In view of Fry's testimony that he never signed any guaranty whatever in the matter of this loan, which assertion was directly contradicted by the testimony on plaintiff's side that, on July 9, 1915, two days after the date stated on the reverse side of the paper upon which the memorandum was written, an undertaking, calling itself a guaranty, was executed by Fry and handed to the bank's cashier, we cannot say that the trial judge committed error when he admitted in evidence the questioned memorandum, stating, as it does, in defendant's own handwriting, "I have no objection to signing a separate guaranty." To say the least, this memorandum, under the circumstances, tended to show the improbability of the truth of plaintiff's denial of what purported to be his signature to the undertaking sued upon.

The present case is quite different from Darragh v. Stevenson, 183 Pa. 397, 404, cited by appellant. There, the only issue before the court was as to the genuineness of defendant's signature to the note in suit. It was held that plaintiff's book charge against defendant of an amount similar to that named in the note, and a letter, dated nearly five years after the date of the note and making no mention thereof, were properly excluded, on

the ground that they did not tend to show defendant had executed the obligation sought to be enforced. Here, as before stated, the memorandum objected to did tend, under the accompanying circumstances, to show that defendant had executed the so-called guaranty relied upon by plaintiff. The other papers objected to were plainly admissible as parts of the transaction under investigation.

The fifth assignment complains that the court below erred in charging the jury as follows: "The agreement, or as it has been called, the guaranty, which is alleged to have been signed by Mr. Fry, created......a surety liability, that is, the relationship between John M. Patterson and H. C. Fry, if he did sign this guaranty, was that of principal and surety." This instruction accords with the law as recently ruled by us. In Miners State Bank v. Auksztokalnis, 283 Pa. 18, 26-8, where the agreement sued upon stated, "I hereby......guarantee payment" of an attached note, we explicitly held that these words of undertaking formed an agreement in writing to "answer for the default of another," as that term is used in the Act of July 24, 1913, P. L. 971, which provides that "every written agreement hereafter made by one person to answer for the default of another shall subject such person to the liabilities of suretyship......unless such agreement shall contain in substance the words: 'This is not intended to be a contract of suretyship.'" This, without more, is sufficient to dispose of appellant's contention that the court below erred in viewing the Act of 1913 as applicable to the present case, and in charging accordingly.

The sixth assignment complains of part of the charge, wherein the trial judge instanced one of the witnesses who had testified concerning the signature in controversy, and, after stating the opportunity this particular witness had for judging as to the genuineness of the signature, said, "Now, would that qualify him to testify as to the exact signature of H. C. Fry to a questioned

document?" adding, "Whether it does or not is, of course, for you to determine, and as to every other witness in the case, apply the same rule." The particular witness instanced by the judge was introduced by plaintiff, hence the instruction, so far as it appeared to query the qualification of this witness, could have done defendant no harm. The instruction may, however, be sustained on broader grounds, for, when the excerpt from the charge is read with its context, it is very plain that the word "qualify" was not used in any technical sense, to give the impression that the qualification of an expert or semi-expert witness was for the jury rather than the court, but simply to convey to the jury the idea that, in weighing the testimony of the several witnesses in the class under discussion, they should take into account the opportunity each one may have had to form a proper judgment as to the genuineness of defendant's signature.

The seventh and eighth assignments complain of general advice given to the jurors in relation to weighing the evidence of the witnesses in the case. It is hardly necessary to specifically discuss these assignments. Suffice it to say that, when the charge is read as a whole, it is apparent that the excerpts here complained of, with their context, simply lay down rules for the assistance of the jury. These instructions cannot in any proper sense be construed as binding the jurors to reject the testimony of a witness which, to quote from the first excerpt questioned, "appears to you as unreasonable and improbable, not the way in which people ordinarily act," or, to quote from the second excerpt here questioned, to accept the testimony of a witness whenever the jury considered such testimony to be "corroborated or strengthened by other witnesses in the case"; the trial judge did no more than advise the jury on these points.

The ninth assignment complains of an excerpt from the charge where the judge said to the jury, "If you come to the question of the expert testimony in this case, then you compare the signature with the admitted genuine

signatures for yourselves and determine whether it is his signature or not." Appellant strenuously contends that this in effect told the jury that they might ignore the testimony of his expert witness, who had said on the stand that the signature was a forgery. Here, again, however, when the charge as a whole is read, it becomes plain that the jury could not have so understood the excerpt in question. The judge had previously instructed at large as to expert witnesses and their testimony, and in that connection had plainly told the jurors it was for them to determine what weight they would give to such testimony, and, after specifically calling attention to the testimony of defendant's expert,—to his opinion that the signature in question was "not the signature of H. C. Fry," and his reasons for so believing,—the judge said to the jury, as above quoted, that it was their right to compare the contested signature with the admitted genuine signatures, and to determine the question of the genuineness of the former for themselves. Immediately after this, the judge continued: "You have a right to consider all the evidence in the case in determining whether it is his signature or not. You have the testimony of John H. Mellor, who says he saw him sign it, and of H. C. Fry who says he didn't sign it. In addition to that you have the testimony of......experts testifying as to whether or not it is his signature." Taking these instructions as a whole, they correctly left the question of the genuineness of the signature to the jury and did not minimize the importance of the testimony of defendant's expert.

The tenth assignment complains of an excerpt from the charge which states, "You have also the fact or facts of the guaranty and other papers that were introduced in this case, allowed to have been all filed away in the First National Bank of Rochester and evidently forgotten, because the note was charged off the books of that bank after it was not paid in 1922." This was really a judicial suggestion in favor of defendant's contention,

intended to call the jury's attention to the defendant's claim that, if such an undertaking as that sued upon had existed, it would not have been filed away and forgotten by the bank; for, immediately after the above quoted excerpt, the trial judge said to the jury: "If this guarantee existed at that time, and if it was known to the officers of that bank at that time, the natural thing for them to do would have been for them to go out and get this guarantee [and] call Mr. Fry's attention to it." In short, when this part of the charge is read as a whole, it becomes clear that the jurors could not have been misled, as appellant suggests, into the belief that the trial judge intended to instruct them that they must accept as facts the genuineness of the guaranty and that it was filed away with the note at the time it was executed. On the contrary, the part of the charge here in question states, in effect, that the long neglect to produce the alleged guaranty might be taken as some evidence that it had not existed at all; and this, as said before, could not have injured defendant.

The eleventh and twelfth assignments complain of answers affirming points submitted by plaintiff, in which the position of law is assumed that the so-called guaranty was in effect a suretyship, in case the jury found defendant had signed the paper in controversy. The remaining assignments complain of the refusal to give binding instructions, to grant a new trial, and of the entry of judgment on the verdict. All of these have been amply covered by what we have said in disposing of previous assignments.

The judgment is affirmed.